USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1095

 JANE DOE,

 Plaintiff, Appellant.
 __________

 UNITED STATES OF AMERICA,

 Intervenor, Plaintiff,

 v.

 ANTOINE WALKER,

 Defendant, Appellee.
 ____________________

 RONALD MERCER, MICHAEL IRVIN, CHAUNCEY BILLUPS,

 Defendants.
 __________

 NOW LEGAL DEFENSE & EDUCATION FUND,

 Interested Party.
 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Richard G. Stearns, U.S. District Judge]

 Before

 Boudin, Circuit Judge
 
 Bownes, Senior Circuit Judge,
 
 and Stahl, Circuit Judge.
 
 
 
 Margaret A. Burnham with whom Burnham & Hines was on brief for
appellant.
 Nicholas C. Theodorou with whom Toni G. Wolfman, David A.
Anderson and Foley, Hoag & Eliot LLP were on brief for appellee.
 

October 4, 1999

 BOUDIN, Circuit Judge. This appeal presents an unusual
question of Massachusetts law concerning the possible duty of a
social host to protect his guest from the criminal acts of another
guest where this can be done without risk to the host. Because the
appeal is from a dismissal for failure to state a claim, Fed. R.
Civ. P. 12(b)(6), we set forth the facts as alleged in the
complaint, drawing reasonable inferences in favor of the non-moving
party, here the appellant "Jane Doe." See Day v. Massachusetts Air
Nat'l Guard, 167 F.3d 678, 680 (1st Cir. 1999). 
 From the complaint, the following allegations can be
derived. Doe first became acquainted with the appellee, Antoine
Walker, a professional basketball player, around May 1997, and
dated him sporadically thereafter. In the course of their dating
relationship, Doe had on several occasions visited Walker's home in
Waltham, Massachusetts, where she became acquainted with Michael
Irvin, who lived in Walker's home. Similarly, Doe met Dennis
Smith, who also lived in Walker's home.
 On the night of November 9, 1997, Doe went to a comedy 
club in Boston, Massachusetts, where she socialized with Walker,
Irvin, and Smith, as well as two of Walker's teammates--Ronald
Mercer and Chauncey Billups--whom Doe had not previously met. As
the group prepared to leave the club, Irvin told Doe that Walker
wanted her to visit him at his home. Walker and Smith left the
club in one car while Billups drove Doe, Irvin and Mercer in
another car. When Billups' car arrived at Walker's home, Doe was
directed to Irvin's bedroom. There, all three men began to subject
Doe to a series of sexual acts, including sexual intercourse,
without her consent and despite her attempted resistance. At one
point during this assault, Walker entered Irvin's bedroom, and
Irvin asked Walker "Don't you want some?" but Walker declined and
left.
 After Walker left Irvin's bedroom, the assault continued. 
Doe awoke the next morning. She located Smith, who drove her home
but told her not to report the incident. Later that day, Doe
sought medical attention at the Boston Medical Center. The medical
examination revealed bruises about Doe's body and injuries to her
throat, cervix and rectum, and she was diagnosed as suffering from
shock. That same day, Doe provided police with a report of the
assault. This is the gist of the allegations in the complaint.
 On April 15, 1998, Doe filed suit in federal court,
naming Mercer, Irvin, Billups and Walker as defendants. As
amended, Doe's complaint asserted claims against Mercer, Irvin, and
Billups under the Violence Against Women Act, 42 U.S.C. 13981, as
well as state claims of assault and battery and intentional
infliction of emotional distress. Doe also asserted a state common
law claim of negligence against Walker, contending that he breached
a duty that he owed to her in his role of social host. Only this
single claim against Walker is the subject of this appeal.
 On May 14, 1998, Walker moved to dismiss the claim
against him on the ground that Doe had failed to state a claim. On
December 18, 1998, the district court granted Walker's motion to
dismiss; it reasoned that Walker had no duty under Massachusetts
law to intervene or otherwise to protect Doe from the assault by
the others. On February 19, 1999, the district court entered a
separate, final judgment as to Walker pursuant to Fed. R. Civ. P.
54(b), permitting this immediate appeal while Doe's suit against
the other three defendants continues.
 If Walker were a passerby who ignored a stranger in
peril, this would be an easy case. For a variety of reasons,
Anglo-American law, unlike some Continental regimes, imposes no
general duty to assist others in peril. See 3 Harper, James &
Gray, The Law of Torts 18.6, at 718-19 (2d ed. 1986). The
reasons for this reluctance to impose such a duty are the usual
compound of history and policy. See id. at 719 n.10, 725 n.26. 
Massachusetts courts interpreting the common law follow this
general principle. See generally Jean W. v. Commonwealth, 610
N.E.2d 305, 318-19 (Mass. 1993) (O'Connor, J., concurring)
 Yet in Massachusetts, as elsewhere, there is continuing
pressure to carve out special situations in which some kind of duty
to protect may be found. Two sets of Massachusetts precedents are
invoked by Doe here: the most helpful to her arise in cases
recognizing various common law duties of property owners toward
guests, other invitees and even trespassers; and the other,
arguably less relevant here, are cases in which a host takes
affirmative steps that causally connect to later harm done by a
guest to a third party (e.g., a social host serving liquor to an
intoxicated guest who later drives home and hits a pedestrian). 
E.g., McGuiggan v. New England Tel. & Tel. Co., 496 N.E.2d 141, 146
(Mass. 1986).
 The common law duties of a property owner toward a guest
generally include an obligation to take reasonable care to provide
a safe premises, including warnings to the guest as to dangers of
which the host knows or should know. Polak, 487 N.E.2d at 215-16. 
In principle, nothing would prevent applying this obligation where
the host knew that another guest had a record of committing violent
acts. Several Massachusetts cases, involving failures of a
property owner to protect his guests from the criminal acts of
others on the premises, declined to hold the hosts liable, but in
doing so, stressed that the host had no reason to know that
criminal acts were likely until it was too late to prevent them. 
Anthony H. v. John G., 612 N.E.2d 663, 666 (Mass. 1993); Husband v.
Dubose, 531 N.E.2d 600, 603 (Mass. App. Ct. 1988).
 But suppose that the social host becomes aware of a crime
in progress involving an assault by one of his guests upon another;
that the host could avert or ameliorate the danger at no risk to
himself; and that he nevertheless chooses to do nothing. The
district court, drawing every possible inference in favor of Doe
based on the bare bones complaint, was prepared to assume that
Walker had authorized or at least endorsed the invitation to Doe
and that Walker had not only become a witness to a rape but had
known that Doe was being assaulted and that she had not consented
to the encounter. And while the district court does not directly
mention the opportunity for Walker to halt the assault without risk
to himself, that is an inference at least as easy to draw in favor
of Doe as the other two. (Of course, further evidence might reveal
that Walker could have done nothing to stop the assault, but
actions ranging from telling the others to stop to calling 911
present themselves as reasonable possibilities.)
 Facing this situation squarely, the district court
concluded that Walker would still have no duty to intervene. The
district court explained:
 Rather, the law discourages such intervention
 as much as human sentiment applauds the good
 Samaritan. The law is so for reasons of
 social policy that are intended to curb
 vigilantism and to avert the risk of untrained
 civilians causing personal injury to
 themselves or creating an even greater risk to
 the victim.

Added to the practical considerations mentioned by the district
court is the general reluctance of the law to impose affirmative
duties to aid except in narrowly defined situations based on
special relationships (e.g., parent-child, policeman-citizen) and
the benefit of bright lines in reducing litigation.
 But Massachusetts case law does not definitely rule out
liability in the hypothetical case we have posited. The only
precedent cited to us that is closely in point is Husband v.
Dubose, 531 N.E.2d 600 (Mass. 1988), where the defendant was sued
when unexpectedly one of her two guests drew a knife, stated that
she intended to kill the other guest and eventually inflicted knife
wounds on the other guest. Since the defendant had no reason to
expect the fight, the court easily rejected lack of a prior warning
as a ground of liability. Id. at 603. Needless to say, a
defendant is "not required to take precautions against a sudden
attack from a third person which he has no reason to anticipate." 
Id., at 602 (quoting Restatement (2d) of Torts 314A, cmt. e
(1964)).
 However, Husband also addressed the claim that the
defendant might have breached a duty to render aid once the knife
attack had begun. The court held that the host, "now in danger
herself and badly frightened, could not have been expected to
disarm [the assaulter] or to remain in the house," and it said that
the defendant's warning to the plaintiff to flee "was an adequate
response to a very dangerous situation that had arisen suddenly." 
Husband, 531 N.E.2d at 603. After noting that it was the plaintiff
who had chosen "to ignore the warning", the court concluded:
 We are . . . not prepared to say that
 prevailing values and expectations required
 the defendant to be more vigilant of security,
 to intervene directly, or to summon assistance
 at the risk of serious personal injury to
 herself or of causing greater danger to the
 plaintiff. . . . [W]e conclude, as did the
 [trial] judge, that the circumstances imposed
 no duty on the defendant.

Id. at 672 (footnote omitted).
 Assuredly, Husband would protect Walker if he had
believed that he could not intervene without risk to himself or to
Doe. But if Walker could have intervened without risk, we think
that it is far from clear that the Husband decision forecloses
liability; technically, the case did not decide the issue because,
as the court construed the facts, there was no such opportunity for
a riskless rescue. Indeed, the court pointed to the lack of proof
that, if the police had been summoned by the defendant, help would
have arrived in time to prevent the stabbing.
 Indignation is not a reliable trigger for imposing a duty
to act since the common law refuses to impose liability in a wide
swath of cases where morality would require action (typified by the
refusal to throw a drowning stranger a rope from the pier). Still,
it is instructive to consider an older decision, cited to us by
neither of the parties, with egregious facts. In Pridgen v. Boston
Housing Auth., 308 N.E.2d 467 (Mass. 1974), the Supreme Judicial
Court cast aside the usual distinction between misfeasance and
nonfeasance and upheld a jury verdict for the plaintiff where a
child trespasser had crawled into an elevator shaft of a building
owned by the defendant and the building agent, despite notice and
a plea from the boy's mother, failed to turn off power in the
elevator.
 The child was thereafter injured and the jury found the
building owner liable for the "wilful, wanton or reckless conduct"
of its agent, the standard deemed to apply in the case of a
trespasser. In upholding the verdict, the SJC said that it did not
matter that the defendant's conduct could be described simply as a
failure to act. Id. at 476-77. The case is clearly
distinguishable in that it did not involve a failure to intervene
in criminal conduct by one person on the premises directed against
another and that none of the concerns about vigilantism or risk to
the owner were present. However, decisions like Pridgen do suggest
that the SJC, like most other courts, responds as much to facts as
to abstractions, and it confirms to us that further development of
the facts in this case is well warranted before Doe's claim is
written off as hopeless.
 We would affirm without hesitating if Massachusetts case
law had squarely rejected liability in the case of the social host
who costlessly could have saved a guest from harm but failed to
act. Plaintiffs who come to federal court and ask federal judges
to forecast a substantial change in state law will normally get a
cold reception. Ryan v. Royal Ins. Co., 916 F.2d 731, 744 (1st
Cir. 1990). But we think that the Massachusetts courts have not
clearly spoken one way or the other and, while they would surely
give weight to concerns about vigilantism, they might on extreme
facts (as in Pridgen) choose to treat inaction as equivalent to
action.
 The legal issue presented is one that has important
social and moral implications, and we decline to decide it without
more facts. In areas like this one, the common law tradition is
one of deciding such matters in the concrete and not in the
abstract. This is in part because further facts may make it
unnecessary to decide the hard case but also because the facts are
likely to contribute to a more sensitive assessment of what the law
"is" (which, absent decisive precedent, means what it "should be"). 
Our preference for a better record is well supported and, while not
mandatory, is one which we are entitled to require for reasons of
prudence.
 The same paucity of facts makes it impractical for us to
certify the issue to the Massachusetts Supreme Judicial Court. Of
course, we could pose the question on one set of extreme assumed
facts, but suppose the SJC replied that liability on such facts
would exist: it is at least even odds that one or more of the
extreme facts so assumed would be disproved at the summary judgment
or trial stage, and there is no assurance that anything the SJC
said about that hypothetical case would tell us how to solve the
matter on the facts actually presented.
 Accordingly, we hold that dismissal at this stage was
premature, vacate the judgment of dismissal, and remand to the
district court for further development of the facts. We do not,
however, foreclose the possibility of summary judgment in favor of
Walker after a more complete record has been developed. It is far
from clear whether Walker authorized, acquiesced or even knew of
Doe's presence at the house prior to the alleged assault; nor is it
clear that he knew that an assault was occurring. Further, as
Irvin was himself living in the residence and extended the
invitation, this might mitigate any duty that Walker might
otherwise have had.
 An alternative resolution deserves some consideration by
the district court. The claim against Walker, unlike the claims
against the other defendants, is not coupled with a federal claim
against him, nor is there any suggestion of diversity jurisdiction. 
In such a case, the statute gives the district court discretion to
decline jurisdiction over a supplemental state claim where, as
here, it raises a novel or complex issue of state law. 28 U.S.C.
 1367 (c)(1). Cf. Houlton Citizens' Coalition v. Town of Houlton,
175 F.3d 178, 192 (1st Cir. 1999). Occasionally, we have even
directed such a dismissal where the federal claims have disappeared
and where no economies justified having a federal court resolve the
remaining state issues. See id.
 However, in this instance economies may exist since
discovery and possibly trial may proceed in respect to the other
defendants. But the district court can balance this against the
benefit of having the state system resolve an unusual question of
state law with broad implications for state policy. So far as we
can ascertain, the statute of limitations on Doe's claim would not
expire until November 2000 (see M.G.L.A. ch. 260 2A), and it is
probably subject to the Massachusetts one-year tolling statute in
any event. See id. ch. 260, 32; Liberace v. Conway, 574 N.E.2d
1010, 1011-13 (Mass. App. Ct. 1991).
 The judgment of the district court is vacated and the
matter is remanded for further proceedings consistent with this
opinion.
 It is so ordered.